## NICHOLS v. NICHOLS.

No. 2996.

Court of Civil Appeals of Texas. Waco.

Jan. 24, 1952.

Rehearing Denied March 20, 1952.

Henry Klepak, John P. Koons, Dallas, for appellant.

Charles O. Shields, Dallas, for appellee.

TIREY, Justice.

This is a child custody case. The appellee, Perry B. Nichols, filed a motion in the district court of Dallas County in this cause to change the custody of his two minor children from his divorced wife to himself. Appellant answered the motion and denied that any change had occurred which would justify the court in taking the custody of the children from her and awarding it to appellee, and asked that he be held in contempt for failure to make payments for the support of the minor children as originally decreed, setting out that he was in arrears in the sum of $1,400.

The court, after a hearing, found that appellee was in arrears in payments for the support of the children in the sum of $500 and awarded said sum to appellant, but refused to enter a contempt order. The court found that conditions had changed and awarded the care and custody of the two minor children to the father and the mother has appealed.

At the request of appellant, the trial court filed findings of fact and conclusions of law as follows:

"Findings of Fact.

"1. That Perry B. Nichols and Mary Nell Nichols are the parents of two children * * * ages nine and twelve.

"2. That Perry B. Nichols and Mary Nell Nichols were divorced in the County of Dallas on or about the 16th day of July, 1947, at which time the plaintiff, Mary Nell Nichols, was awarded custody of the two minor children of the parties hereto, subject to visitation by the defendant as follows:

" 'It is further agreed that Mary Nell Nichols shall have full care and custody of their minor children, Christopher Perry Nichols and David T. Nichols, and that the said Perry B. Nichols shall have the right of visiting said children from the hours of two o'clock in the afternoon to six o'clock on Saturday afternoon of each week and shall have the right of visitation of said

children on Sundays, provided same does not interfere with their Sunday School.'

"3. That defendant Perry B. Nichols, was ordered in said judgment on the 16th day of July, 1947, to pay One Hundred Fifty ($150.00) Dollars per month as child support for the two said minor children, and that the said Perry B. Nichols was Five Hundred ($500.00) Dollars in arrears at the time of such trial.

"4. That since the rendition of the judgment on the 16th day of July, 1947, there was a change of condition relative to the custody of the two minor children since the plaintiff, Mary Nell Nichols, had become emotionally unstable, which emotional instability had culminated in her attempted suicide on or about September 23, 1950, when one of the minor children of the parties was in the house. That plaintiff had threatened suicide on several occasions in the presence of said children, and had used profane, abusive language in their presence.

"5. That the emotional instability demonstrated by the plaintiff, Mary Nell Nichols, was detrimental to the best interest of said children.

"6. That Perry B. Nichols has remarried, and is maintaining a Christian, proper and suitable home for said children, and that he is a fit and proper person to have the custody and control of said children, and the obligation of rearing them, and that it will be to the best interest of said children if they are in the custody and control of their father, Perry B. Nichols, rather than to continue in the custody of their mother, Mary Nell Nichols.

"7. That said minor children are two boys and should be together."

"Conclusions of Law.

"1. That it is to the best interest of said minor children that their custody be changed so as to award such custody and control to their father, Perry B. Nichols, subject to visitation by Mary Nell Nichols, the mother of said minor children, as follows:

" 'That the plaintiff, Mary Nell Nichols, shall have the right of visiting said children and having them with her on December 27, 28, 1950, and from noon on Saturday until six P.M. on Sunday for every other weekend beginning on January 13, 1951.'

"2. That Perry B. Nichols should pay the sum of Five Hundred ($500.00) Dollars for child support to the plaintiff, Mary Nell Nichols, for child support which he was in arrears since on or about the 28th day of March, 1950." ·

This case was transferred from the Dallas Court of Civil Appeals to this court by order of the Supreme Court.

Appellant's points 1 and 2 are as follows:

"1. The finding of fact made by the trial court to the effect that the plaintiff, Nell Nichols, was mentally unfit to have custody of the children in question, was a finding contrary to the evidence adduced and is not supported by sufficient evidence.

"2. The finding of fact made by the trial court to the effect that the plaintiff, Nell Nichols' mental condition was of such a nature as to be detrimental to the welfare and interest of the children in question, was contrary to the evidence adduced and is not supported by sufficient evidence."

■■■ It is well settled in Texas than when a district court has awarded the care and custody of minor children to one of the parents, that the person seeking to change the judgment of the court in this respect has the burden of establishing that conditions have changed and that the best interests of the minors require the court to change such custody; that a child custody judgment is res judicata only of what was then before the court; that a subsequent material change of conditions brings into being a new and independent cause of action; that our law writes into each of such judgments, in substance, that its finality ends when and if conditions affecting the welfare of the child have materially changed; that the welfare of the child is the concern of sovereignty and in a very real sense the State is interested in the result, though not a nominal party, and that such concern is a continuing one until such child becomes sui juris. Before a court is authorized to change or modify an order relating to child

custody the test is that the proof must show that the situation and character of the respective parties have so changed as to render it to the best interest of the infant that the former order be set aside or modified. See Oldham v. Oldham, Tex.Civ.App., 135 S.W.2d 564, points 4 to 9, at page 568. See also cases collated under Texas Digest, Vol. 29, Parent & Child, ☞2(3) and (4), and Texas Digest, Vol. 15, Divorce, ☞312 and 312.1–312.7. In Swift v. Swift, Tex.Civ. App., 37 S.W.2d 241, 243, this court said: "While large discretion is vested in the trial court in awarding the custody of minors, such awards are subject to review on appeal." Points 7–8, opinion by Chief Justice Gallagher.

The case of Murphey v. Walker, Tex.Civ. App., 209 S.W.2d 371, holds in effect that the judgments of the trial court in child custody cases are not to be disturbed on appeal unless the award of custody is so contrary to the great preponderance of the evidence as to show an abuse of discretion. See also Wilson v. Underhill, Tex.Civ. App., 131 S.W.2d 19, and Moore v. Moore, Tex.Civ.App., 213 S.W. 949. Many cases are found under the above citations.

■ In the light of the foregoing rules, it is our duty to review the evidence tendered, which consists of more than 600 pages. We are not unmindful of the responsibility resting upon us and we have carefully examined the testimony, and it is our view that the appellee has failed to carry his burden under the applicable law of our state. A statement is necessary.

As shown by the findings of fact, appellant and appellee were divorced in 1947 and the care and custody of the minor children awarded to the appellant. Appellee was required to pay $150 per month for the support of the children. Appellee was not punctual in carrying out the support orders of the court and at one time he was placed in jail for contempt for such failure and remained in jail for a period of seventy-two hours before he complied with such orders. No explanation satisfactory to this court appears in the record as to why appellee failed to meet the legal duty imposed upon him by the court as to these support payments. Under the evidence tendered, it is our view that if appellee had diligently tried to comply with the support orders that he would have been spared the penalty of being placed in jail for a period of seventy-two hours. The father's duty to support his children is not one solely imposed by law. Such duty of the father is imposed by all that is finest and best in all the civilizations that have preceded ours and the duty to feed and care for an offspring is recognized and practiced in substantially all forms of animal life.

At the time appellant and appellee were divorced they owned a home and it appeared to be free from debt. Under the settlement agreement appellant was to have the use of the home and the appellee was to pay the taxes and upkeep thereon, and if and when the home was sold the proceeds were to be divided equally between the parties. After the divorce was granted appellee permitted taxes to accumulate on the home and the taxes at one time exceeded the sum of $1,000, and from time to time the City had been threatening foreclosure on account of delinquent taxes. Evidence was tendered to the effect that for the first year after the divorce was granted appellant and appellee did not see much of each other, and there were some misunderstandings and some friction between them on account of the failure of the appellee to pay the support orders and due to the fact that when he had the children on the weekends he would take them on rides in the car when he would have engagements with ladies. During the years of 1948 and 1949 appellant and appellee saw each other a little more often and it appears that appellee, during this time, was occasionally having meals in the home with his former wife and the children and by the early part of 1950 appellee began making frequent visits to his former wife and his children, sometimes dining with them three times a day. It was during the early part of 1950 that appellee and appellant began giving consideration to remarriage and this relationship continued, according to appellee's testimony, until early summer, 1950 (the exact time not given), and, according to appellant's testimony, until a short time be-

fore she attempted suicide in September, 1950. In the latter part of August, 1950, appellee left on a trip that took him to New York City and he did not return until the latter part of September, 1950. The court in its judgment found that appellant "is in arrears in the sum of $500.00 in child support from the period of March 28, 1950 to December 5, 1950." Under this finding appellee was delinquent in his support orders when he left for a summer trip; however, he testified to the effect that while he was gone he sent money (the amount not given) to his former wife and that while he was away she collected $160 at the studio for work that was due him and that she had the use of his car while he was away. The evidence shows that appellee was concerned about the condition of his former wife and some time in 1950, before he went away to New York, he had her under the care of a Dr. Barnett and she had been in a hospital, and later he and his wife consulted with a Dr. Bloss of the City of Dallas and he was present when Dr. Bloss made some examination of his wife, and later they decided to consult Dr. John C. Montgomery, and appellee placed appellant in his care, all of which took place before appellee went on his summer trip. Under the foregoing conditions we find the appellee leaving on the trip to New York without paying up his delinquent support orders, with knowledge of the condition of his former wife who was under the care of a physician and who had the care and custody of his children (and the sole responsibility of providing sustenance for them). It is true that appellee was under no legal duty, because of the illness of his former wife, to remain in Dallas, but he was aware of her illness and her legal responsibility to have the care and custody of the children and the duty to provide each day for their food; however, under the foregoing conditions, it is our view that the failure of appellee to pay the support orders and make provisions for the sustenance of his children before going away on this trip is in irreconcilable conflict with the trial court's finding that appellee "is a fit and proper person to have the care and custody of his minor children."

We come now to consider the court's finding to the effect that appellant's emotional instability was detrimental to the best interests of the children. Bearing in mind all of the testimony tendered and particularly that part disclosing the relationship existing between appellant and appellee and particularly the relationship existing during the year 1950, we think it is pertinent to state that appellee became engaged to Miss Elizabeth Eakin on October 10, 1950, intermarried with her on October 20th, and filed this motion to change custody of the children on October 27, 1950. The case was tried December 6th.

Dr. John C. Montgomery, a psychiatrist, testified at some length with reference to the mental condition of appellant. Necessarily we cannot quote his testimony at any great length, but he testified in part to the effect that the appellant was placed under his medical care some time in July, 1950; that appellee made the arrangements for the visit and treatments; that he saw appellant at his office once each week for a period of an hour or an hour and a half at a time until the latter part of August, 1950; that in August, 1950, when he saw her he found that she was dependent upon appellee and her conversation disclosed her wish that she could get appellee to see things like she saw them; that she would like to have Perry back. He further testified to the effect that appellant is not and has not been psychotic at any time; that she was not mentally unstable, but that she had some emotional instability, which is a common thing in many dependent persons, but that she was not a paranoid and that she was not a schizophrenic; that he had seen Mrs. Nichols since her attempted suicide in September, 1950, and he said in part: "A. I consider that she is in much better condition now than she was when I last saw her in August, when I saw her in August before the attempted suicide.

"Q. Doctor, would you say whether or not this attempted suicide has relieved her of any burden that she may have carried before? A. Well, I don't know that the suicide did it, but she certainly has been relieved of her excessive dependency upon

Perry and upon the possibility that Perry might come back to her.

"Q. I will ask you, Doctor, in your opinion, from your observation of her and examination of her, would you say that the children would be in any kind of danger living with their mother, Nell Nichols? A. No.

"Q. * * * from your examination of her and your diagnosis, would the children be in any danger living with their mother, Nell Nichols? A. No, they would not.

    *    *    *    *    *    *

"Q. Tell the court whether or not there would be any danger of physical injury to those children. A. No, I do not consider that they would be in any physical danger whatever.

"Q. * * * would you say that their living with their mother would subject them to any abnormal type of living? A. No.

"Q. * * * is there anything in Mrs. Nell Nichols' demeanor that if the children continue to live with her, they would not live a normal life? A. There is nothing about her—her thinking, in my opinion, that would warp their thinking.

"Q. * * * Doctor, as a result of your examination of her and your diagnosis of her, would she be a proper person because of what observation you have made of her to have the care and custody of these children? A. Medically speaking, yes."

In his testimony concerning her mental condition we find these statements:

"The internal pressure was her own desire for an ideal she had set up. It included Perry, and him in a home, an environment such as she wanted. Now, it is my opinion that pressure is gone now. * * *

"The Court: Has there been anything of any particular significance that had led you to that opinion? A. Yes, her own statement and expression of feeling free from the former desires she had to include Perry in her life. She formerly would not state she could or would give up her ideal of finally regaining Perry or gaining him back or her way of thinking, and acting. She has stated to me that she has given that up; that she feels divorced psychically as well as legally.

"The Court: Do you think that is conclusive upon the matter, I mean medically speaking, is that conclusive to you upon that matter? A. In the setting in which I saw it, and the manner in which she expressed it, I do believe that it impressed me as being true.

"The Court: When was the last time that you saw Mrs. Nell Nichols? A. It has been two or three weeks now.

"The Court: Will she continue to come to you for treatment, or has anything been said about that? A. No definite appointments have been made; however, that is usual in my business. I do not let people come to me unless they feel that their condition is such that they need to go into it.

"The Court: Do you feel that further treatment is necessary? A. I think considering her personality she may want to have some further treatments, but that again is not a thing that is absolutely necessary. * * *

"The Court: I believe you did say this: It may have no connection with this question, but I will ask you this. Do I understand you to say that she might be given in the future to hysteria or the possibility of hysteria? A. I think almost anyone might under enough pressure. That is a factor that is variable with the amount of pressure a person is put under.

"The Court: Well, do you think she could withstand more pressure? A. Now?

"The Court: Now. A. Than she could before?

"The Court: Yes. A. Yes, I do, because she has more of a feeling of security. She has a plan for the future. Formerly she would not make any definite plans for the future because she had not given up her ideal, but she has made a plan for the future now, and I believe she will stick to it. * * *

"The Court: I will ask the question that I did not let you answer, whether or not she is emotionally stable now or on the road to emotional stability? A. Well, I hate to answer a question like that, because as I say, it all depends on how much pressure a person is put under. She is probably more stable than many people and less stable than

other people. The amount of pressure that you can stand—that your emotions can stand without your becoming so disturbed that you lose control varies with your personality.

"The Court: Do you have any medical test or rule for how much pressure we ought to withstand? A. No, sir, I don't think there is any. There is nothing but a general rule that we believe that a person should be able to withstand enough emotional pressure to remain within the bounds of social usage, to run into any serious conflict with their environment, that is all a matter of judgment."

■ Although appellant had been under the care of Dr. Barnett prior to her attempted suicide and had been examined by Dr. Bloss prior thereto, neither of these physicians was tendered as witnesses. Since the attempted suicide took place on September 23, 1950, and since the trial was had on December 6, 1950, and since the court's order would control the custody of the children from the date of the trial, we think that it was pertinent for the court to ascertain the mental condition of appellant at that time and whether or not her condition was such that the best interests of the children required that the custody be changed from her to appellee, and the court's interrogation of Dr. Montgomery shows that he had this view in mind. The only medical testimony before him was that of Dr. Montgomery. Assuming without deciding that Dr. Montgomery was an interested witness, his testimony comes under the following rule: "When the evidence of an interested witness is direct and positive on the point at issue * * * and where there are no circumstances in the record tending to discredit or impeach his testimony, a verdict contrary thereto will be set aside, that such testimony will justify an instructed verdict, and that a judgment contrary thereto may be reversed and rendered." Dunlap v. Wright, Tex.Civ.App., 280 S.W. 276, 279. Appellant was a patient of Dr. Montgomery before and after her attempted suicide. According to his view the main cause of appellant's emotional instability had been removed and he saw in the appellant a person who had recovered her stability and from his observation she was, in his opinion, from a medical standpoint, a proper person to have the care and custody of the children. There are no facts and circumstances tendered in evidence to indicate that appellant had not recovered from her emotional instability that resulted in the attempted suicide in September, 1950. If we be mistaken in this view, then we say that the great preponderance of the evidence tendered is to the effect that the appellant had recovered from her emotional instability, and that the evidence was insufficient to sustain the court's finding that she was emotionally unstable at the time of the trial. There is no testimony tendered in the record to indicate that the appellant's mind was not normal or that she was suffering from emotional instability or that she was not a proper person to have the care and custody of the children at the time the divorce decree was entered in 1947. The testimony is without dispute that the children were intelligent, well trained, well behaved, and exhibited nice manners. Evidence was tendered to the effect that appellant became emotionally unstable some time during the year 1950. Appellee testified in part:

"Q. I will ask you, Mr. Nichols, if it isn't a fact that you testified that you had discussed with Nell Nichols in June or in the spring * * * the prospect of remarrying Nell? A. To the degree of saying that we would try it out.

"Q. * * * Did you mean that you were going to try a common law marriage with her? A. No, sir. I meant that we would associate with each other. * * * That I would have meals with her. That we would have some social— * * * I meant that I would come out there and have some meals with her. That we would go to shows together.

"Q. Now, actually, you were considering remarriage, weren't you? A. For a while I considered it, yes.

"Q. * * * In spite of all these things you say occurred, you were still seriously reconsidering marrying her, weren't you? A. No, sir. When things began to occur I no longer considered it nor discussed it with her.

"Q. Didn't you testify that all of these happenings happened in 1948, and in 1947, and in 1946, back to 1943. All of these things that you are complaining about, this hysterics, cutting her wrist, and supposed to be taking gas and overdoses of pills, and throwing herself into the creek, and throwing herself down the stairs, and throwing herself under your automobile, and hitting herself with the brick, all that occurred before the period of time that you were seriously considering remarrying Nell? A. Yes, I misunderstood you.

"Q. And in spite of all those things, you were still seriously considering remarrying her, weren't you? A. For a while, yes.

*    *    *    *    *    *

"Q. You didn't reconsider remarrying her for a minute after you went to these psychiatrists, did you, this summer?

*    *    *    *    *    *

"A. Yes, I told her this summer before we went to Dr. Bloss.

"Q. State whether or not you told her before you went to New York that you would not remarry her? A. That was long before I went to New York that I told her that.

"Q. Long before this suicide attempt, wasn't it? A. Yes."

■ Notwithstanding the testimony tendered as to appellant's emotional upsets and frustrations following the divorce, it is without dispute that she had nurtured and cared for these two children and they were well behaved, well mannered and well trained. The evidence tendered discloses much bickering between appellant and appellee because of appellee's failure to pay the support orders promptly from the time the divorce was granted until the early part of 1950. Then we find appellant and appellee much friendlier with each other. Later we find them in daily association in the home with the children, sometimes dining together as much as three times a day, and appellant and appellee giving consideration to a remarriage and a reuniting of the family ties. Then when summer came appellee took a trip to New York and late in September, after he came back, we find him with a new love interest and an abandonment of any interest in appellant, and appellant says that this information from appellee that there would be no reconciliation and remarriage came to her immediately before her attempted suicide and that the shock was "too much" for her. Viewing all of the testimony we think the inference is inescapable that this conduct of appellee greatly affected the mind of appellant and contributed to her emotional instability. The inference is supported by a great preponderance of the evidence. Nevertheless the evidence wholly fails to show that the mental upsets and emotional instability of appellant affected the care and custody that she gave to the children to the extent that it was detrimental to the best interests of the children. We do not mean to say that she could do her best under the burden that she was carrying, but the evidence is without dispute that she did carry her burden in this behalf. On the contrary the evidence shows without dispute that appellee failed to carry the burden placed upon him by the divorce decree as to the support orders and that he did so under the coercion of his former wife and the pains and penalties of the law. Viewing the record as a whole, we think that appellee has failed to carry his burden in that he failed to show that it would be to the best interests of the children for their custody to be changed from appellant to him and that the trial court's finding to this effect is without sufficient support in the evidence and is an abuse of his discretion. As we have previously stated, under this record we cannot agree that appellee is a fit and proper person to have the care and custody of his children and that such finding of the court is without sufficient support in the evidence and that such finding is an abuse of his discretion. We are of the further view that the court's finding wherein he said that the appellant's emotional instability was detrimental to the best interests of the children is against the great weight and preponderance of the evidence and is not supported by sufficient evidence on which to change the custody of the children from the mother to the father.

Because of the views here expressed we think the trial court's order changing the

custody of the children from the mother to the father is an abuse of his discretion.

Accordingly, the judgment of the trial court awarding the care and custody of the children to the appellee is reversed and judgment is here rendered restoring the care and custody of the children to the appellant, as ordered by the divorce decree.

LESTER, C. J., took no part in the consideration and disposition of this case.